**HILL RIVKINS LLP**
*Attorneys for Respondents*
45 Broadway – Suite 1500
New York, New York  10006
(212) 669-0600

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

HARREN & PARTNER SHIP MANAGEMENT   :
de MEXICO S.A.P.I. and TYPHOON            :   Index No.:  **21 cv 5361 (LGS)**
OFFSHORE S.A.P.I. de CV,                        :

               Petitioners,                        :

    **-against-**                                          :

AMERICAN BUREAU OF SHIPPING, ABS     :
GROUP OF COMPANIES, INC. ABS
CONSULTING, LTD., ABSG CONSULTING
INC.,                                                          :

               Respondents.                       :
------------------------------------------------------------X

# MEMORANDUM OF LAW OF RESPONDENT
# AMERICAN BUREAU OF SHIPPING IN SUPPORT
# OF ITS MOTION TO COMPEL ARBITRATION

John J. Sullivan | Charles M. Henderson III
HILL RIVKINS LLP
45 Broadway, Suite 1500
New York, NY 10005
212-669-0600

*Attorneys for Respondents*

## **TABLE OF CONTENTS**

**Pages**

TABLE OF AUTHORITIES ii

PRELIMINARY STATEMENT 1

RELEVANT FACTS 3

ARGUMENT - 10

    A.  THE PARTIES' COMMERCIAL RELATIONSHIP WAS
       EMBODIED IN A SERIES OF COMMUNICATIONS THAT
       CONTAINED ABS' ARBITRATION TERMS AND/OR
       INCORPORATED THE FULL SET OF ABS' RULES ALSO
       CONTAINING THE ARBITRATION PROVISIONS 11

    B.  AS THE DIRECT, INTENDED BENEFICIARIES OF THE
       AGREEMENT TO RENEW THE CLASSIFICATION OF
       THE VESSEL, H&P AND TYPHOON ARE ESTOPPED
       FROM DENYING THE OBLIGATION TO ARBITRATE
       UNDER THOSE AGREEMENTS 16

CONCLUSION 20

# **TABLE OF AUTHORITIES**

**Cases**                                                                                          **Pages**

*American Bureau of Shipping v. Tencara Shipyard, S.P.A,*
  170 F.3d 349 (2d Cir. 1999)                                                             16-18

*China Shipping Container Lines Co. Ltd. v. Big Port Srvc. DMCC,*
  803 Fed. App'x 481 (2d Cir. 2020)                                                        10-11

*Gabriel Capital, L.P. v. CAIB Investmentbank AG,*
  28 A.D.3d 376, 814 N.Y.S.2d 66 (1st Dep't 2006)                                           12

*Glencore, Ltd. v. Degussa Engineered Carbons, L.P.,*
  848 F. Supp. 2d 410 (S.D.N.Y. 2012)                                                       12

*Hellenic Investment Fund, Inc. v. Det Norske Veritas,*
  464 F.3d 514 (5th Cir. 2006)                                                              18

*JLM Indus., Inc. v. Stolt-Nielsen SA,*
  387 F.3d 163 (2d Cir. 2004)                                                               15-16

*Kahn Lucas Lancaster, Inc. v. Lark Int'l, Ltd.,* 1
  86 F.3d 210 (2d Cir. 1999)                                                                12

*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.,*
  252 F.3d 218 (2d Cir. 2001)                                                               15-16

*Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,*
  460 U.S. 1 (1983)                                                                         15

*Moskalenko v. Carnival PLC,*
  2019 WL 1441127 (E.D.N.Y. Mar. 29, 2019)                                                  15

*Pagaduan v. Carnival Corp.,*
  709 Fed. App'x 713 (2d Cir. 2017)                                                         15

*Salzano v. Lace Entertainment, Inc.,*
  2014 WL 3583195 (S.D.N.Y. Jul. 18, 2014)                                                  16

*Soliman v. Subway Franchisee Adver. Trust Fund, Ltd.,*
  999 F.3d 828 (2d Cir. 2021)                                                               10

*Spinelli v. National Football League*,
  96 F. Supp. 3d 81 (S.D.N.Y. 2015)              15-16

*Sundance Cruises Corp. v. American Bureau of Shipping*,
  7 F.3d 1077 (2d Cir. 1993)                   3

*Thomson-CSF, S.A. v. American Arb. Ass'n*,
  64 F.3d 773 (2d Cir. 1995)                  18

## **<u>Statutes</u>**

Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.*       1, 11-12

## PRELIMINARY STATEMENT

Respondent, AMERICA BUREAU OF SHIPPING ("ABS"), hereby submits this Memorandum of Law in support of its Motion to Compel Arbitration pursuant to 9 U.S.C. §§ 4 and/or 206, and in opposition to Petitioners' Motion for a Permanent Injunction.  This Court previously issued a preliminary injunction against ABS's proceeding with its demand to arbitrate its claims for indemnity against Petitioners, HARREN & PARTNER SHIP MANAGEMENT de MEXICO S.A.P.I. ("H&P Mexico"), and a number of related Harren & Partner entities (Harren & Partner Ship Management GmbH & Co. K.G. ("H&P GmbH"), Poseidon Capital GmbH, Harren & Partner Maritime Services GmbH, Harren Shipping Services GmbH & Co. K.G. and Harren & Partner) (all listed entities with the inclusion of H&P Mexico collectively referred to as "H&P"), and TYPHOON OFFSHORE S.A.P.I. de CV ("Typhoon").  ABS seeks indemnity in connection with claims asserted against it by more than forty plaintiffs in a civil action for negligence filed in the District Court of Texas for Harris County ("the Texas Action"). [1]  The allegedly injured plaintiffs were stationed on board the M/V *Troll Solution*, a vessel owned by Typhoon and managed by H&P Mexico and/or H&P ("the Vessel").  ABS had provided classification services pursuant to its own classification rules for the Vessel, commencing while the Vessel was still in the design and construction phases, and continued for a succession of owners, managers, operators and lessees of the Vessel, up to the date when the casualty at issue occurred.  The classification rules confer an obligation upon Typhoon and H&P to defend and indemnify ABS for any claims by third parties arising from the services ABS provided in 2014-

---

[1] The four Respondents in this case include ABS as well as ABS Group of Companies, Inc., ABS Consulting, Ltd., and ABSG Consulting, Inc. (collectively "ABS Group").  Following the initial demand for arbitration and the filing of the Petition in this Action, the plaintiffs in the Texas Action agreed to dismiss ABS Group from the litigation and proceed to trial solely against ABS.  ABS Group still has an indemnity claim against Petitioners for a *pro rata* share of defense costs.

2015 to the Vessel, Typhoon and H&P Mexico; the arbitration provisions in the classification rules require the parties to arbitrate those indemnity claims.

This Court previously issued a preliminary injunction on the grounds that Typhoon and H&P Mexico had demonstrated a likelihood of success in that the correspondence that the parties had submitted to the Court in favor of and/or opposition to the preliminary injunction application did not constitute an agreement in writing within the meaning of Chapter 2 of the Federal Arbitration Act. The Court further concluded that Typhoon and H&P Mexico likely were to succeed in overcoming the contention of ABS that they were estopped from denying arbitration. However, discovery has now revealed that Petitioners actively solicited ABS's classification services in connection with the Vessel in which they were acquiring possession, control and ultimately ownership. Beginning in June 2014, Petitioners requested that ABS complete the Special Survey of the Vessel for the purpose of renewing the five-year Certificate of Classification. During this recertification process, the parties exchanged a series of communications over nearly one year, including several invoices issued by ABS and sent to H&P and Typhoon containing ABS's standard arbitration provisions. In the course of their commercial relationship with ABS, H&P and Typhoon clearly signed off on at least one document incorporating ABS's rules, which included an arbitration provision. The relationship culminated in ABS's issuance to Typhoon and H&P of an amended five-year renewal Certificate of Classification in February 2015. This Certificate named Typhoon Offshore as the owner of the vessel and contained the identical arbitration provision as in the previous classification certificates, including the previous renewal certificate issued in August 2014 at the request of H&P and Typhoon. The totality of the parties' relationship confirms that the parties had entered into an enforceable agreement for the providing of ABS's classification services to the Vessel

and to H&P Mexico and Typhoon, for their direct benefit, for the account of H&P and Typhoon, and subject to the terms and conditions of the ABS Rules.  To the extent that H&P and Typhoon contend that they were only acting as agent for the prior owners in arranging the classification renewal, they nevertheless were the intended beneficiaries of that class renewal once they placed the Vessel into service and subsequently took ownership in early 2015, such that both are estopped from denying the obligation to arbitrate.

### **RELEVANT FACTS**

ABS is an American maritime classification society and a New York 501 (c)(6) Not-for-Profit organization that develops standards (or "Rules") for assessing the design and construction of new vessels and the integrity of existing vessel and marine structures.  (Stipulation[2] ¶ 2). "When requested, a society reviews the design and surveys a ship before, during, and after construction to verify compliance with the relevant international safety conventions and applicable rules of the classification society".  *Sundance Cruises Corp. v. American Bureau of Shipping*, 7 F.3d 1077, 1081 (2d Cir. 1993).

The Vessel at issue in this case was a self-elevating vessel, commonly referred to as a "jack-up rig".  It was a self-propelled vessel with three retractable legs, which could be lowered to the seabed floor to lift the hull of the Vessel out of the water.  (Stipulation ¶ 3).  Construction of the Vessel was commenced in 2007 at COSCO Nantong Shipyard in China, pursuant to ABS's Rules.  (Stipulation ¶ 4).  Upon completion of construction of the Vessel in 2010, ABS issued an initial Certificate of Classification with an expiration date of June 28, 2015, and that identified COSCO Nantong as the shipyard and the Vessel's original owner as Remedial Offshore.  (Exhibit A).  The flag state for the Vessel was Vanuatu.  (Stipulation ¶ 34).

---

[2] "Stipulation" refers to the joint Stipulation filed by counsel for Petitioners on behalf of all parties in connection with these motions, ECF Doc. No. 38.

H&P officially approached ABS regarding the classification of the Vessel on or about June 6, 2014, when it sought permission from ABS to access class records for the Vessel. (Exhibit C).  However, Jan-Hendrik Dammann of H&P GmbH, who was intimately involved in the day-to-day efforts to renew class for the Vessel, admitted that at least one H&P entity became involved with the TROLL SOLUTION sometime between December 31, 2013, and May 13, 2014.  (Exhibit C, October 7, 2021, Deposition of Jan-Hendrik Dammann ("Ex. B") at 36). H&P's initial correspondence to ABS included a copy of a Letter of Intent, dated June 5, 2014, confirming that Harren & Partner Shipment Management GmbH & Co., K.G. ("H&P GmbH") and Typhoon would be entering into a Ship Management Agreement for the Vessel. (Exhibit C). By email dated June 25, 2014, Mr. Dammann (from an address in Bremen, Germany) forwarded a completed ABS Change of Ownership Form in order to facilitate access to the class surveys in ABS's online system.  The ABS Change of Ownership form forwarded by Mr. Dammann lists the "Managing Company" as "Harren & Partner Ship Management Mexico, S.A.P.I. de C.V." and "Typhoon Offshore S.A.P.I. de C.V. c/o Harren & Partner Ship Management GmbH & Co. KG" as the "Billing Client." (Exhibit D).

Although the original Certificate of Classification issued upon completion of the construction of the Vessel was not due to expire until June 28, 2015, H&P approached ABS in June 2014[3] to arrange the Special Surveys that would result in the renewal of the certification of the Vessel and the issuance of a five-year renewal Certificate of Classification.  Specifically,

---

[3] Under the ABS Rules, special surveys for the renewal of five-year certification typically would be completed during the three-month period leading up to the expiration of the original or renewal certificate, but ABS will give "[s]pecial consideration" for the timing of Special Surveys "in the case of vessels of unusual design, in lay-up or in unusual circumstances".  *ABS Rules for Survey After Construction*, Part 7, Rules 5.3, 5.5.  (Exhibit E).  ABS' John Preston, Chief Surveyor, Offshore, testified that Part 7 of ABS Rules are incorporated into any Certificate of Classification issued by ABS. See Sept. 15, 2021, Deposition of John ("Ex. G"), at 107.

H&P sent ABS a letter dated 23 June 2014, H&P Mexico, over the signature of Heiko

Felderhoff, apparently a managing director of both H&P Mexico and H&P GmbH.  The 23 June

letter requested ABS "to perform the 5 years class renewal for the MOU 'Troll Solution'", and

identified three individuals as "contact persons", each of whom appear to have been employees

of H&P GmbH.[4]  *See* Exhibit H.   The exchange of correspondence on that day also included an

e-mail from Sebastian Kloth of H&P GmbH stating in pertinent part as follows:

> Finally we signed the ship management contract for Troll [S]olution last Tuesday
> so we are now officially in charge.  Unfortunately, owners still did not send us the
> original authorization letter for ABS yet. Have they by chance already been in
> direct touch with you directly?
>
> For the next employment for the rig, we need to provide the potential client with
> an official statement from class, that the vessel is currently undergoing the class
> renewal at Rotterdam within today. Otherwise we might lose this business.
>
> Accordingly we were asking ourselves if you would also accept the signed
> coversheet of the Ship Management contract in order to give us full access and
> authorization to request the class renewal.
>
> As mentioned before we need above mentioned letter within today to your soonest
> reply would be highly appreciated.

(*Id.*).  The ship management contract was apparently executed between Typhoon and H&P

Mexico, and/or its "nominee" identified as "any other entity of the Harren & Partner group", on

or about June 17, 2014, as testified to by H&P's Dammann, and included a handwritten and

initialed notation that H&P Mexico was "always to be guaranteed by the holding company",

identified as H&P GmbH.  (Ex. B, at 64, Exhibit G).   The IMO Unique Company Identification

Number of H&P GmbH, rather than H&P Mexico, is listed in Box 5 of the ship management

contract. (Exhibit G).

---

[4] The letter provided e-mail addresses for each of the three H&P individuals with the domain of "@hp-shipping.de" and offices phone numbers beginning with the 421 area code for Bremen, Germany, and mobile number prefixes of 151 which are also for Germany.  Mr. Dammann confirmed the German H&P email address during his deposition. Ex. B, at 29-33.

The "potential client" referred to in H&P's correspondence was PEMEX Exploración y Producción S.A. de C.V. ("PEMEX"), the Mexican national oil company.  According to a "Working Agreement" among PEMEX, H&P Mexico and Typhoon, H&P Mexico and Typhoon were to supply PEMEX with the "Services of a jack up and autopropulsable vessel for support in the maintenance of offshore well and PE[MEX] facilities".  (Stipulation ¶ 9).  The specifications attached to the Working Agreement provided in pertinent part that "[t]he Jack-up, self-propelled ship shall be classified by ABS".  (Exhibit H).

In addition to applying for the five-year classification renewal, H&P and Typhoon also requested, *inter alia,* that ABS assist them in obtaining approval from the flag state of Vanuatu for the configuration of temporary living quarter modules or "TLQ" aboard the Vessel in December 2014.  In connection with this work, Mr. Dammann countersigned ABS's written proposal detailing the scope of the work and fees to be charged on behalf of H&P Mexico and Typhoon.  (Ex. B at 139; Exhibit I).  The second page of the fee quote states in pertinent part as follows:

> Acceptance of this fee quote indicates acceptance of terms laid out in the ABS Generic Rules for Conditions of Classification Materials & Weldings & Surveys After Construction.  Copies of the ABS Rules may be obtained at http://eagle.org.

(Exhibit I).  Mr. Dammann verified his signature at deposition.  (Ex. B, at 100).  He confirmed that H&P had access to "class status and classification documents" through the eagle.org website and could also submit drawings for the Vessel for ABS' review through this website. (*Id.,* at 73, 80).

ABS' John Preston, Chief Surveyor, Offshore, testified that ABS Generic Rules for Conditions of Classification Materials & Weldings & Surveys After Construction are a "list of rules that apply generically, which means that they apply across multiple rule sets, and one of

those generic rules is Part I" which can be accessed on ABS' website.  (Ex. G, at 124-25, 129,

132).  ABS' Theodorus Pronk, Principal Surveyor in charge of ABS' Rotterdam office, also

testified that Part I of the ABS Rules can be easily downloaded from ABS' website, and that Part

I applies to all vessels, including offshore vessels like the *Troll Solution*.  (December 8, 2021,

Deposition of Theodorus Pronk (Ex. J), at 114, 130).

ABS' Part 1 of the Rules for Building and Classing Steel Vessels, also defined as the

"Scope and Conditions of Classification", contains the following arbitration provision:

> Any and all differences and disputes of whatsoever nature arising out of services
> under these Rules shall be put to arbitration in the City of New York pursuant to
> the laws relating to arbitration there in force, before a board of three persons,
> consisting of one arbitrator to be appointed by ABS, one by the Client, and one by
> the two so chosen. … The arbitration is to be conducted in accordance with the
> rules of the Society of Maritime Arbitrators …The governing law shall be the law
> of the State of New York, U.S.A.

(Exhibit E).  ABS invoiced H&P and Typhoon for classification and statutory renewal services

in 2014 and 2015. (Exhibit K).  With respect to the payment of ABS' invoices, H&P's Dammann

testified that ABS' invoices were received by H&P, on behalf of Typhoon, in Bremen, Germany.

(Ex. B, at 111).  For the actual payment of ABS' invoices, H&P's Dammann testified that "H&P

was making any payments on – from Typhoon's account.  So H&P was acting on behalf of

Typhoon and paying from Typhoon's account.  I mean via a trust of the account."  (Ex. B, at

116).  Mr. Dammann further testified that he was charged by his supervisor, Robert Fowler, to

review all ABS invoices to verify that what was being billed was actually performed. (*Id.* at

113).  He also testified that he was involved with correspondence with ABS to correct the billing

customer for ABS' services from H&P Mexico to Typhoon. (*Id.* at 129).  H&P's Dammann

testified that he "would have reviewed this invoice" in referring to a March 18, 2015, ABS

invoice addressed to Typhoon.  (*Id.* at 129, 148-49; Exhibit K).  ABS' Pronk confirmed this

information and further stated that H&P initially had provided the wrong billing address.  (Ex. J, at 41, 53).  ABS was paid in full for its services by H&P and/or Typhoon in the amount of €39,074.40, and there are no outstanding invoices.  (Ex. J, at 43-44; Exhibit. P).  This invoice included the following notation:

> Unless otherwise mutually agreed in writing all services, publications, and products provided and certificates issued in conjunction with this invoice are governed by the "Scope and Conditions of Classification" as contained in the entirety of Part 1 of the ABS  Rules for Building and Classing Steel Vessel in effect on the issue date of this invoice, said "Scope and Conditions are hereby incorporated by references into this invoice as if fully set forth herein. A copy of the "Scope and Conditions of Classification" found in Part 1 of the ABS Rules for Building and Classing Steel Vessel, may be obtained at any ABS office or over the internet at www.eagle.org.

(Exhibit K).  Mr. Pronk, who has been in charge of ABS' Rotterdam office since 2013 testified that it was his office's procedure during relevant periods to print out the invoice contained in Exhibit K, on paper, that had a series of terms and conditions on it and then mail the invoice with terms and conditions printed on the back to the client in the form annexed hereto as Exhibit K. (Ex. J at 12, 46-47, 126-27).  He in fact testified that he was never aware of any invoice that was sent out of the Rotterdam office in 2014-15 that did not have the terms and conditions printed on the back of any invoice.  (*Id.* at 127).   As shown in Exhibit K, the invoice's terms and conditions have a similar arbitration provision.

ABS provided classification and statutory reviews of the Vessel in 2014-15, at the request and direction of H&P and Typhoon, pursuant to ABS' terms and condition of its engagement. Along with its invoices and the applicable Rules and Guides, ABS issued two Certificates of Classification during this period – one naming Trollrig I as owner in August 2014, and another to identifying Typhoon as owner in February 2015.  (Exhibit A).  For example, H&P's Dammann confirmed that the August 2014 was received in Bremen and then was scanned and sent to H&P

Mexico, as a matter of course.  (Ex. B, at 113; Exhibit A).  These Certificates were governed by

ABS Rules, as noted in the footer of Page 1 and as testified to by ABS' Pronk (Ex. J, at 22;

Exhibit A).  These certificates contained on their second pages applicable arbitration and hold

harmless provisions as follows:

> 6. **HOLD HARMLESS**
> The party to whom this certificate is issued, or his assignee or successor in interest, agrees to release ABS and to indemnify and hold harm ABS from and against any and all claims, demands, lawsuits, or actions for damages, including legal fees to persons or other legal entities and/or property, tangible, intangible or otherwise which may be brought against ABS incidental to, arising out of or in connection with the work done, services performed or material to be furnished under this certificate, except for those claims caused solely and completely by the negligence of ABS, its agents, employees, officers, directors or subcontractors….
>
> \* \* \*
>
> 8. **ARBITRATION**
> Any and all differences and disputes of whatsoever nature arising out of this certificate shall be put to arbitration before a board of three persons, consisting of one arbitrator to be appointed by ABS, one by Client[5], and one by the two so chosen. The decision of any two of the three on any point of points shall be final. …"

(Exhibit A).

Lastly, both ABS' Preston and Pronk testified that essentially all services performed by

ABS for H&P, Typhoon and the *Troll Solution* incorporated Part I of ABS' Rules, which

contains an arbitration provision.  (Ex. G, at 79, 81, 108; Ex. J, at 22).

On May 5, 2015, H&P and Typhoon were operating the Vessel in the Bay of Campeche

in the Gulf of Mexico, attempting to position the Vessel next to PEMEX's CAAN-A oil

production platform.  As the Vessel was being positioned and its legs lowered to the seabed, the

starboard leg slid into a buried channel beneath the sea floor, resulting in a dangerous list from

which the Vessel could not recover.  (Stipulation ¶ 18).  More than forty individuals working on

and/or stationed on the Vessel allegedly were injured while trying to evacuate.  (*Id.* ¶¶ 19-20).

---

[5] The Certificate defines "Client" as "the vessel Owner or other client [] of ABS".  Exhibit A at ¶ 2.

The allegedly injured crewmembers and platform workers commenced the Texas Action in 2016, alleging among other things that "ABS was negligent in its inspection, review, and classification of the vessel *Troll Solution*".  (*Id.* ¶¶ 20, 28).

ABS maintains that it was not negligent in performing its services as a classification society, but rather the casualty of May 5, 2015, was entirely the result of the operational and navigational errors and omissions of H&P, Typhoon, and various marine engineering firms retained by H&P and Typhoon in connection with placement of the Vessel next to the CAAN-A platform.  Included in Part I of ABS' Rules for Building and Classing Steel Vessels is the following indemnity provision, pursuant to which ABS seeks indemnification from Typhoon and H&P:

> The party requesting services hereunder, or his assignee or successor in interest, agrees to release ABS and to indemnify and hold harmless ABS from and against any and all claims, demands, lawsuits or actions for damages, including legal fees, to persons and/or property, tangible, intangible or otherwise which may be brought against ABS incidental to, arising out of or in connection with this Agreement, the work to be done, services to be performed or material to be furnished hereunder, except for those claims caused solely and completely by the negligence of ABS, its agents, employees, officers, directors or subcontractors. …

Exhibit E.

## ARGUMENT

Because the Petitioners are bound by a valid agreement to arbitrate, this Court should enter an order compelling them to arbitrate.  On a motion to compel arbitration, the court should consider all relevant, admissible evidence submitted by the parties, including declarations, depositions and exhibits.  *Soliman v. Subway Franchisee Adver. Trust Fund, Ltd.*, 999 F.3d 828, 833-34 (2d Cir. 2021).  As detailed below, that evidence demonstrates that the parties did enter into a valid agreement to arbitrate, for the express benefit of the Petitioners.  Although a district court may have the authority to issue a permanent injunction where the parties have not entered

in a valid and binding arbitration agreement, *China Shipping Container Lines Co. Ltd. v. Big Port Srvc. DMCC*, 803 Fed. App'x 481, 485 (2d Cir. 2020), the parties to this case did enter into a valid and enforceable agreement to arbitrate, so that Petitioners cannot show irreparable injury sufficient to support a permanent injunction.  According, ABS's motion to compel should be granted and Petitioners' motion for a permanent injunction should be denied.

A.    **THE PARTIES' COMMERCIAL RELATIONSHIP WAS EMBODIED IN A SERIES OF COMMUNICATIONS THAT CONTAINED ABS' ARBITRATION TERMS AND/OR INCORPORATED THE FULL SET OF ABS' RULES ALSO CONTAINING THE ARBITRATION PROVISION**

This Court has previously concluded that Chapter 2 of the Federal Arbitration Act, 9 U.S.C. §§ 201 *et seq.* ("FAA") applies to whether Petitioners are obligated to arbitrate, and that Chapter 2 requires either a signed agreement to arbitrate or the embodiment of the agreement to arbitrate in a series of letter or telegrams.  (ECF Doc. No. 24 at 2-3).  While this Court initially concluded that Petitioners would likely succeed on their merits of their resistance to arbitration, the more complete record that has been developed through discovery conclusively demonstrates that H&P and Typhoon solicited ABS's classification services for their own benefit, and that the agreement covering those services included all of the terms and conditions of the ABS Rules, including the obligation to arbitrate.

Although H&P solicited ABS' services before this period, Typhoon and H&P Mexico assumed control and management of the M/V *Troll Solution* in the Spring of 2014 in anticipation of their eventual ownership and full control.  At that time, they initiated a relationship with ABS to undertake the early renewal of the Vessel's classification, in place of and/or on behalf of the Vessel's then registered owners, with the full expectation that they would be the beneficiaries of the renewal of the classification upon their completion of the purchase of the Vessel.  The terms

11

of the agreement under which ABS undertook the renewal of the classification unquestionably included an agreement to arbitrate within the meaning of the FAA.  The parties exchanged a series of correspondence throughout their relationship, including at least one proposal signed by H&P, on its own behalf and/or of Typhoon, which incorporated ABS' classification rules, constituting an agreement to arbitrate within the meaning of Chapter 2.  *See* Ex. 9.  Accordingly, H&P and Typhoon should not be heard to deny the obligation to arbitrate in the agreement they solicited and whose benefits they enjoyed.

Under Chapter 2 of the FAA, an agreement to arbitrate must be signed or, if unsigned, in an exchange in a series of letters, or other similar written communication, including telefax and e-mail.  *Glencore, Ltd. v. Degussa Engineered Carbons, L.P.*, 848 F. Supp. 2d 410, 423 (S.D.N.Y. 2012); *Gabriel Capital, L.P. v. CAIB Investmentbank AG*, 28 A.D.3d 376, 378, 814 N.Y.S.2d 66, 68 (1st Dep't 2006).  The exchanged communication may incorporate an arbitration provision by reference.  *Gabriel Capital, L.P.*, 814 N.Y.S.2d at 68.  The arbitration provision can take the form of either "an arbitral clause in a contract" or a stand-alone "arbitration agreement".  *Kahn Lucas Lancaster, Inc. v. Lark Int'l, Ltd.*, 186 F.3d 210, 216-17 (2d Cir. 1999).  Unquestionably, a contract existed among ABS and H&P and Typhoon when H&P and Typhoon solicited ABS to undertake the renewal of the classification, commencing as early as May 2014.  As detailed below, that contract contained "an arbitral clause" within the meaning of Chapter 2 of the FAA.

The relationship among H&P, Typhoon and ABS began as early as late 2013, but certainly no later than May 2014, when individuals employed by H&P reached out to ABS in connection with the early renewal of the five-year Certificate of Classification for the M/V Troll Solution.  At the time, the owner of the Vessel was still TrollRig1, and BC Holdings also had a

role in ownership and/or management of the Vessel. (Ex. B at 52-53, 95-96). Typhoon entered

into a "lease" agreement for the Vessel and appointed H&P Mexico to act as managers of the

Vessel. (*Id.* at 25-27, 50, 54). At the time, H&P Mexico was acting through H&P GmbH. (*Id.*

at 51, 78, 143). Although the original Certificate of Certification for the Vessel was not due to

expire until June 28, 2015 (Exhibit A), on or about May 27, 2014, H&P GmbH employees in

Germany wrote to ABS in Germany to advise that the Vessel's "owners have agreed that we

carry out the class renewal complete before leaving Rotterdam," and further requested that ABS

provide its "official quotation for carrying out class renewal". (Exhibit H.) These same H&P

personnel thereafter informed ABS on June 19, 2014, that "Harren & Partner are now the official

manager of the Troll Solution", and requested "full access to all class records and all information

that is available for Troll Solution so we can get started with the class renewal". (Exhibit M).

On June 23, 2014, H&P Mexico wrote to ABS in London to request "on behalf of owners we

herewith apply to perform the 5 years class renewal for the MOU "Troll Solution", and identified

three employees of H&P GmbH who would serve as the "contact persons" for ABS. (Exhibit H).

H&P personnel informed ABS on that date that PEMEX, its "potential client" required "an

official statement from class, that the vessel is currently undergoing the class renewal at

Rotterdam within today". (*Id.*). By July 29, 2014, H&P had sought and obtained access to

ABS's online "Eagle" system to access designs, place orders, receive survey notifications and

view invoices. (Ex. B at 73).

Commencing in August 2014, ABS issued a series of invoices for the services solicited

by H&P and Typhoon, each of which provided that "all services, publications, and products

provided and certificates issued in conjunction with this invoice are governed by the 'Scope and

Conditions of Classification' as contained in the entirety of Part 1 of the ABS Rules for Building

and Classing Steel Vessels in effect". (Exhibit K). Upon completion of the first round of

classification renewal services that H&P and Typhoon had solicited while the vessel was located

in Rotterdam, ABS issued a five-year renewal Certificate of Classification, dated August 14,

2014. (Exhibit A). The Certificate of Classification contained on the reverse a set of conditions,

including a hold harmless/indemnification provision and an arbitral clause. The hold harmless

provides as follows:

> The party to whom this certificate is issued, or his assignee or successor in
> interest, agrees to release ABS and to indemnify and hold harm ABS from and
> against any and all claims, demands, lawsuits, or actions for damages, including
> legal fees to persons or other legal entities and/or property, tangible, intangible or
> otherwise which may be brought against ABS incidental to, arising out of or in
> connection with the work done, services performed or material to be furnished
> under this certificate, except for those claims caused solely and completely by the
> negligence of ABS, its agents, employees, officers, directors or subcontractors.

(*Id.*). The Certificate's arbitration provision in turn provides that "[a]ny and all differences and

disputes of whatsoever nature arising out of this certificate shall be put to arbitration before a

board of three persons, …". (*Id.*).

Even after the renewal Certificate was issued in August, the relationship among H&P,

Typhoon and ABS continued with H&P and Typhoon requesting additional classification

services from ABS, including additional surveys and waiver requests submitted through ABS to

the Vessel's flag state of Vanuatu. For at least one of these solicitations, in November 2014, an

H&P GmbH employee acting for H&P Mexico and Typhoon countersigned an ABS fee quote

proposal, which provided that "[a]cceptance of this fee quote indicates acceptance of terms laid

out in the *ABS Generic Rules for Conditions of Classification, Materials, and Welding, and

Surveys After Construction*. (Exhibit L). Copies of the ABS Rules may be obtained at the ABS

website at http///:www.eagle.org. (Ex. G at 124-125; Ex. J at 114, 130). The arbitration

provision in the ABS Rules referred to provides:

> Any and all differences and disputes of whatsoever nature arising out of the
> services under these Rules shall be out to arbitration in the City of New York
> pursuant to the laws relating to arbitration there in force, before a board of three
> persons, consisting of one arbitrator to be appointed by ABS, one by the Client,
> and one by the two so chosen. --- The arbitration is to be conducted in accordance
> with the rules of the Society of Maritime Arbitrators, Inc. in the English
> Language. …

(Exhibit E).  All told, ABS issued no fewer than four (4) invoices for the classification services

requested by H&P and Typhoon, each of which contained an arbitration provision and/or

incorporated[6] the ABS Rules.  (Ex. B at 109-127; Exhibit K).  ABS invoiced H&P and/or

Typhoon no less than the amount of €39,074.40, all of which was paid by H&P, on Typhoon's

behalf, without protest or reservation. (Exhibit L).

As Petitioners signed at least one document incorporating the arbitration provision in the

ABS Rules and received and paid a series of invoices containing ABS's arbitration provision, the

Court should then look to the underlying claims to determine whether they are subject to

arbitration.  Once an agreement to arbitrate is identified, the strong federal policy in favor of

arbitration militates in favor of resolving any doubts in favor of arbitrability.  *Moses H. Cone*

*Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *Louis Dreyfus Negoce S.A. v.*

*Blystad Shipping & Trading, Inc.*, 252 F.3d 218, 223 (2d Cir. 2001).  The arbitration provisions

in the invoices, the Certificates of Classification, and Part I of the ABS Rules are sufficiently

broad to encompass essentially any dispute between or among the parties related to ABS's

classification services for the Vessel.  An arbitration provision covering "any and all" disputes,

disagreements, differences, controversies, or claims arising from an agreement will be deemed a

---

[6] Where a contract incorporates another document by reference by describing it in such clear and
unambiguous terms that its identity can be ascertained beyond reasonable doubt", the parties will be
bound by the arbitration provision in the incorporated document.  *Pagaduan v. Carnival Corp.*, 709 Fed.
App'x 713, 715 (2d Cir. 2017); *Moskalenko v. Carnival PLC*, 2019 WL 1441127, at *5-6 (E.D.N.Y. Mar.
29, 2019).

"broad" arbitration clause. *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 172 (2d Cir. 2004); *Louis Dreyfus Negoce S.A.*, 252 F.3d at 224; *Spinelli v. National Football League*, 96 F. Supp. 3d 81, 103-01 (S.D.N.Y. 2015); *see*, *also*, *Salzano v. Lace Entertainment, Inc.*, 2014 WL 3583195, at *3 (S.D.N.Y. Jul. 18, 2014) (arbitration provision that "[a]ll disputes arising from this lease shall be exclusively decided by binding arbitration" was sufficiently broad to cover extra-contractual claims). The arbitration provisions in the Certificates and those incorporated into the fee quote and invoice(s) call for arbitration of "Any and all differences and disputes of whatsoever nature arising out of" the Certificates or "services" provided by ABS. Such broad language certainly would call for arbitration of an indemnity claim by ABS against H&P and Typhoon where ABS has been sued by third parties alleging negligent performance of ABS's surveying and class certification services for a vessel owned and operated by H&P and Typhoon.

**B. AS THE DIRECT, INTENDED BENEFICIARIES OF THE AGREEMENT TO RENEW THE CLASSIFICATION OF THE VESSEL, H&P AND TYPHOON ARE ESTOPPED FROM DENYING THE OBLIGATION TO ARBITRATE UNDER THOSE AGREEMENTS**

To the extent H&P and Typhoon contend they were not the contracting counterpart of ABS, they should be estopped from denying they were not bound by the terms and conditions of the agreement under which ABS provided it services. Under *unequivocal* Second Circuit precedent, where a shipowner acquires a vessel for which classification services have been performed and derives a direct benefit from the classification services, it is estopped from denying an obligation to arbitrate under the contract(s) under which the services are provided. *American Bureau of Shipping v. Tencara Shipyard, S.P.A*, 170 F.3d 349, 353 (2d Cir. 1999). In granting the preliminary injunction in this case, the Court stated that ABS had not shown that an arbitration agreement existed "in relation to Petitioners or a third-party connected to Petitioners". However, the evidence developed in discovery demonstrates conclusively that an arbitral

provision did exist no later than 2013-2014 in the contract under which ABS provided classification services to the M/V *Troll Solution* and her owners.  Those classification services were renewed nearly a year ahead of schedule[7] upon the specific solicitation and request of Petitioners, for their direct benefit.  At the time of ABS' providing of the services, Typhoon and H&P were the lessee and vessel manager, respectively, and were in the process of purchasing the Vessel from the previous owners.  The previous owners had ceased operating the Vessel and had left it in layup in Rotterdam. (Stipulation ¶¶ 7-8, 11).  Petitioners acquired an interest in the Vessel in 2014 for the express purpose of employing it with PEMEX in the Gulf of Mexico, under a contract that expressly required Petitioners to maintain the Vessel's classification. (Stipulation ¶ 9; Exhibit H).  According to Petitioners' own representative, the early renewal of the classification was a requirement of PEMEX.  (Exhibit H).  The Petitioners' own contractual relationship with ABS certainly came to fruition no later than February 2015, when Typhoon completed the closing of its purchase of the Vessel, and ABS issued to Petitioners an amended Certificate of Classification naming Typhoon as owner.  (Stipulation ¶ 16).  The February 2015 Certificate contained the identical terms and conditions as both previous Certificates, including the identical hold harmless and arbitration provisions. (Exhibits B, R, and S).

In *Tencara Shipyard, S.P.A*, a shipyard had constructed a racing yacht pursuant to ABS's rules and classification.  The shipyard and the owners for whom the yacht was built separately sued ABS in Italy and France, respectively, claiming negligence.  ABS commenced an action in this district to compel the shipyard and the yacht's owners to arbitrate the claims of all parties against it in New York.  As Petitioners contend in this action, the owners in *Tencara* claimed that they were not parties to any agreement to arbitrate.  As the Second Circuit held, "[a] party is

---

[7] *See supra*, note 3.

estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause". 170 F.3d at 353 (citing *Thomson-CSF, S.A. v. American Arb. Ass'n*, 64 F.3d 773, 778-79 (2d Cir. 1995)). The direct benefits the owners in *Tencara* enjoyed as a result of ABS's classification of the yacht included significantly lower P&I insurance rates and the ability to sail the yacht under the French flag.

In *Hellenic Investment Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514 (5th Cir. 2006), the Fifth Circuit adopted the Second Circuit's *Tencara Shipyard* holding to conclude that the purchaser of a vessel was estopped from denying the obligation to litigate against the vessel's classification society pursuant to a forum selection clause in the society's earlier contract with the seller of the vessel. The vessel's purchasers sued the classification society, Det Norske Veritas ("DNV") for fraudulent misrepresentation in connection with DNV's surveying of the vessel and renewal of the class certificates. The Fifth Circuit expressly relied on *Tencara Shipyard*, summarizing the Second Circuit's holding as follows:

> The Second Circuit held that the owners and underwriters were bound by the arbitration clause under a theory of direct-benefit estoppel. According to the *Tencara* court, that the owners were able to insure the vessel more cheaply and sail under a French flag were sufficient benefits, directly flowing from the performance of the contract between the shipyard and the classification society, to bind the non-signatory owners to the contract's arbitration clause. The situation in the instant case is no different.

464 F.3d at 518.

In the present case, as discussed above, the early renewal of ABS's Certificate of Classification of the Vessel was initiated by Petitioners approximately in the year before Typhoon completed its purchase of the Vessel and fully twelve (12) months prior to the expiration of the initial Certificate of Classification. Petitioners remained intimately involved in the renewal of the classification, which inured to their direct benefit upon assuming ownership and management. H&P and Typhoon's purposeful efforts throughout this period to solicit

ABS's class services undoubtedly flowed from their obligations under the annex to their contract with PEMEX, which required the following: "[t]he Jack-up, self-propelled ship shall be classified by ABS (American Bureau of Shipping) or another IACS affiliated register." (Exhibit H, Annex B-1, Detailed Specifications, Section 1.1). Even the early renewal was specifically for Petitioners' benefit, as their client PEMEX required the early classification surveys while the Vessel was still in layup in Rotterdam. (Exhibit H). Petitioners' claims that they were somehow unaware of ABS's terms and conditions containing the duty to arbitrate ignores reality and is merely an after-the-fact construct intended to avoid further liability for the underlying accident for which both H&P and Typhoon, as operator and owner of the Vessel, were primarily responsible.

To the contrary, both Petitioners explicitly sought out ABS's class services commencing as early as May 2014, to meet a stated performance obligation of their lucrative contract with PEMEX. Petitioners could not have contracted with PEMEX for the employment of the Vessel to facilitate maintenance of PEMEX facilities in the Bay of Campeche without ABS' classification certification. Maintaining the Vessel in class with ABS was an express condition of the contract, which H&P acknowledged as early as June 2014, when it sought access to the class documentation and solicited ABS to begin the process of surveying the Vessel for purposes of renewal of the class certification. By affirmatively reaching out to ABS for its classification services, H&P and Typhoon enjoyed these direct benefits, among others, and are estopped from denying an obligation to arbitrate under the agreements pursuant to which ABS provided its services.

## **CONCLUSION**

As set out in detail above, Petitioners affirmatively solicited ABS in 2014 to undertake the renewal of the classification of the Vessel, as well as to facilitate other regulatory compliance efforts.  They procured the early renewal of the Certificate of Classification in 2014, and then were provided an amended Certificate after Typhoon completed its acquisition of the Vessel. They also received and paid invoices issued by ABS for the services they solicited, for a total of no less than €39,074.40.  Finally, they countersigned at least one ABS fee proposal to perform survey services connected to the Vessel's compliance with classification and state requirements. Each of these documents contained and/or incorporated an arbitration provision.  Even if Petitioners were not yet the registered owners of the Vessel, their efforts to procure ABS services were for their own direct benefit, as they were working towards the full acquisition of the Vessel and employment for the Vessel that required the renewal of the classification.  They therefore should be estopped from denying the obligation under the terms of the agreements pursuant to which ABS provided its classification services.  Accordingly, this Court should grant ABS's motion to compel arbitration and deny Petitioners' application for a permanent injunction.


DATED:      January 31, 2022
            New York, NY

                            Respectfully submitted,

                            **HILL RIVKINS LLP**

                            By:     */s/ JOHN J. SULLIVAN* _____

                                    JOHN J. SULLIVAN
                                    CHARLES M. HENDERSON, III
                                    45 Broadway, Suite 1500
                                    New York, NY 10006
                                    (212) 669-0600 - Telephone

(212) 669-0698 - Facsimile
jsullivan@hillrivkins.com
chenderson@hillrivkins.com

**ATTORNEYS FOR RESPONDENTS, AMERICAN BUREAU OF SHIPPING, ABS GROUP OF COMPANIES, INC., ABS CONSULTING LTD., AND ABSG CONSULTING INC.**